IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| URSULA MARIE TAYLOR, | ) | CASE NO.  5:20-CV-02010-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Ursula Taylor ("Plaintiff" or "Taylor"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

## I.    PROCEDURAL HISTORY

In October 2017, Taylor filed an application for POD, DIB, and SSI, alleging a disability onset date of March 2, 2017 and claiming she was disabled due to depression, bipolar disorder, ADHD, anxiety disorder, headaches, heart problem, knee problem, and high blood pressure.  (Transcript ("Tr.") at 21, 82,

---

1 On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

94.)  The applications were denied initially and upon reconsideration, and Taylor requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 21.)

On July 24, 2019, an ALJ held a hearing, during which Taylor, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 5, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 21-32.)  The ALJ's decision became final on July 7, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On September 8, 2020, Taylor filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16-17.)  Taylor asserts the following assignments of error:

(1) The ALJ committed harmful error when his RFC did not consider the effect of the combination of Taylor's severe impairments on her ability to engage in substantial gainful activity on a sustained basis.

(2) The ALJ committed harmful error in his determination regarding Taylor's disabling pain and her credibility in violation of Social Security Ruling 16-3p.

(3) The ALJ committed harmful error when he sent interrogatories to the vocational witness after he testified at the hearing and failed to meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 14 at 1.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Taylor was born in December 1972 and was 46 years-old at the time of her administrative hearing (Tr. 21, 31), making her a "younger" person under Social Security regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 31.)  She has past relevant work as a retail cashier/stocker and cosmetologist.  (*Id.* at 30.)

**B.** **Relevant Medical Evidence[2]**

On February 9, 2017, Taylor saw cardiologist Dr. Jeffrey Courson for follow up.  (*Id.* at 507.) Taylor reported feeling well, although she occasionally had mild SVT episodes that stopped when she rested.  (*Id.*)  Dr. Courson told Taylor if her episodes increased in intensity, duration, or frequency she was to call so he could increase her medication.  (*Id.*)  On examination, Dr. Courson found normal rate, regular rhythm, normal heart sounds, no gallop, no friction rub, no murmur, normal gait, and normal coordination. (*Id.*)  Taylor's diagnoses included supraventricular tachycardia, atrial tachycardia, and palpitations.  (*Id.* at 508.)  Dr. Courson noted he was making no changes to Taylor's medication.  (*Id.*)

On May 8, 2017, Taylor saw Tammy Morris at Coleman Professional Services for a diagnostic assessment.  (Tr. 381.)  Taylor reported feeling "off balance" and "immune" to Seroquel, waking up agitated, having mood swings, a lack of appetite, poor sleep, and rapid heartbeat.  (*Id.*)  Taylor told Morris she had a good relationship with her father and was active in her church, including serving as an usher. (*Id.* at 382.)  She described herself as good at her work and "a great/awesome grandmother."  (*Id.*)  Taylor reported working part-time, with above average attendance and exemplary performance.  (*Id.* at 383.)  On examination, Morris found average and cooperative behavior, good eye contact, clear speech, engaged and cooperative mood, congruent affect, logical and circumstantial thought process, unremarkable thought content, and unremarkable cognitive ability, although Morris noted Taylor reported poor focus with poor sleep.  (*Id.* at 392-93.)  Taylor was wringing her hands and moving in her chair during the session.  (*Id.* at 392.)  Morris diagnosed Taylor with unspecified bipolar and related disorder and unspecified insomnia disorder.  (*Id.* at 395.)

On August 10, 2017, Taylor saw Dr. Nilesh Shah for evaluation of her left knee pain.  (*Id.* at 457-61.)  Taylor reported her knee pain began about a month ago when she got out of bed to go to the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

bathroom and her left knee gave out.  (*Id.* at 457.)  The next morning, her left knee was painful and swollen.  (*Id.*)  Taylor reported going to the emergency room twice for the pain and bruising around her knee two weeks ago.  (*Id.*)  Taylor also complained of tenderness.  (*Id.*)  Taylor described the pain as throbbing.  (*Id.*)  On examination, Dr. Shah found antalgic gait, no effusion, erythema or warmth, normal sensory exam, normal alignment of the knee, full range of motion limited by pain, negative Lachman's, posterior drawer, and McMurray's testing, as well as negative varus and valgus stress tests.  (*Id.* at 460.)  Dr. Shah further found no pain to palpation to the patellar tendon, MCL, LCL, medial joint line, lateral joint line, quad tendon, or pes bursa, negative patellar apprehension, and normal left hip rotation.  (*Id.*)  Dr. Shah administered a cortisone injection.  (*Id.*)

On September 18, 2017, Taylor saw Dr. Shah for follow up.  (*Id.* at 453-56.)  Taylor reported her knee hurt worse the day of the injection, but then she had pain relief for about a week.  (*Id.* at 453.)  Her pain then returned to its original level.  (*Id.*)  Taylor told Dr. Shah she did her home exercise program three to four times, she needed a new band, and she was interested in a brace.  (*Id.*)  Taylor described her pain as sharp.  (*Id.*)  On examination, Dr. Shah found antalgic gait, pain with full extension medially, pain with McMurray's testing, and pain to palpation along the medial joint line.  (*Id.* at 456.)  Dr. Shah ordered an MRI.  (*Id.*)

On October 3, 2017, Taylor saw Michelle Eller, APN, at Coleman Professional Services for another evaluation.  (*Id.* at 399.)  Taylor reported she was a "'wreck'"; she fidgeted all the time, she was not eating well and had no appetite, her sleep was off, her mood was different, she was argumentative and having outbursts, she had a physical altercation with her fiancé, and when she was angry, she slammed things and broke things.  (*Id.*)  She told Eller she could think her way into depression.  (*Id.*)  While Taylor denied a lack of motivation, she reported disliking being around people and having anxiety in crowds.  (*Id.*)  Taylor denied manic behavior.  (*Id.*)  Taylor reported incidents at work where her heart was racing

4

and she passed out: once in May 2016 and again in January and March of 2017.  (*Id.*)  Taylor told Eller she was working in home health care, although her hours had been cut to 20-25 hours.  (*Id.* at 400.)

On examination, Eller found normal gait and station, normal muscle tone and strength with no atrophy or deformity, average demeanor, good eye contact, clear speech, full affect, logical thought process, average intelligence, fair attention and concentration, unremarkable thought content, unremarkable cognitive impairment, and good insight and judgment.  (*Id.* at 400-01.)  Taylor reported her mood was "'tired.'"  (*Id.* at 400.)  Eller diagnosed Taylor with unspecified bipolar and related disorder and unspecified insomnia disorder.  (*Id.* at 401.)  Taylor reported she had lab work run every six months by her cardiologist and everything had been good.  (*Id.* at 402.)

On October 16, 2017, Taylor saw Morris for follow up.  (*Id.* at 420.)  Taylor reported work was going well and she was getting 40 hours a week.  (*Id.*)  On examination, Morris found average demeanor, good eye contact, clear speech, anxious, cooperative, and positive mood, congruent affect, logical thought process, average intelligence, fair attention and concentration, unremarkable thought content, unremarkable cognitive impairment, and good insight and judgment.  (*Id.* at 420-21.)  Taylor reported she was doing well, and she was thankful for her job.  (*Id.* at 421.)

On October 27, 2017, Taylor saw Dr. Salvatore Frangiamore for evaluation of her left knee pain.  (*Id.* at 441.)  Her symptoms began months ago and had not changed.  (*Id.*)  Taylor described the pain as sharp and consistent, worse with exercise or strenuous activity, particularly prolonged sitting and standing or walking stairs.  (*Id.*)  Taylor rated her pain as a 7/10 at best and 10/10 at worst.  (*Id.*)  Taylor reported the pain interfered with her sleep, and she had tried injections, anti-inflammatory medication, pain medication, and physical therapy with no relief.  (*Id.*)  On examination, Dr. Frangiamore found grossly normal gait and station, intact sensation, normal motor strength, no evidence of quadricep atrophy, tenderness over the medial joint line, pain and crepitus elicited with patellar compression, pain with range

5

of motion at extremes, and pain elicited with McMurray testing without an audible click.  (*Id.* at 444.)  Dr. Frangiamore noted a left knee MRI revealed a torn meniscus with arthritic changes but no chondral malacia of the medial compartment.  (*Id.*)  Dr. Frangiamore recommended left knee arthroscopy.  (*Id.* at 445.)

On November 9, 2017, Taylor saw Dr. Courson, for follow up regarding her supraventricular tachycardia.  (*Id.* at 356.)  She had been seeing Dr. Courson at least once every six months since August 18, 2016.  (*Id.* at 501-32.)  Taylor reported doing well, although she had occasional palpitations which were "sporadic and self limited."  (*Id.* at 356.)  Her most recent episode was about a month ago.  (*Id.*)  On examination, Dr. Courson found normal rate, regular rhythm, normal heart sounds, no gallop, no friction rub, no murmur, and normal gait and coordination.  (*Id.*)  Taylor's diagnoses included supraventricular tachycardia, atrial tachycardia, and palpitations.  (*Id.*)  Dr. Courson noted:

> Ursula is stable from a rhythm perspective.  She has occasional episodes that are self limited, so we will stay on her current regime, but she is to call if this changes, more frequent, sustained or severe symptoms and we can adjust her meds. She has a surgery planned next week, arthroscopy on her knee and there is no reason from a cardiac perspective that she cannot proceed as planned.  I will see her back in 6 months.

(*Id.* at 357.)

On November 15, 2017, Taylor saw Morris for follow up.  (*Id.* at 404.)  Taylor reported doing well, that she was thankful for her job, she was sleeping better, and she was "'handling things' with her fiancé, home, and children.  (*Id.* at 405.)  Taylor was "always doing something" and talked with her family and friends.  (*Id.* at 406.)  On examination, Morris found Taylor well-groomed, with average demeanor, cooperative behavior, average eye contact and activity, clear speech, "anxious, cooperative [and] positive" mood, congruent affect, logical thought process, and good insight and judgment.  (*Id.* at 404-05.)  Morris noted Taylor "reports and shows on target completion of tasks and thought processing."  (*Id.* at 405.)

On November 27, 2017, Taylor underwent left knee surgery to repair a torn meniscus.  (*Id.* at 437-40.)

On November 28, 2017, Taylor completed an Adult Function Report.  (*Id.* at 278-85.)  Taylor reported she always felt fatigued from her heart condition, her knee caused her to be unable to sit or stand for a long period of time, and her depression caused her concentration to be off.  (*Id.* at 278.)  She reported no problems with personal care, although she needed alarms to remind her to take her medication.  (*Id.* at 279-80.)  She could not stand for too long without getting dizzy.  (*Id.* at 280.)  She could do light housework, although it took her all day because she had to "stop and go."  (*Id.*)  While she reported disliking going outside because she hyperventilated, she also reported going to work Sunday through Thursday.  (*Id.* at 281.)  She could go out alone, but she did not like to because she was paranoid.  (*Id.*)  She did not drive because she thought she would get into an accident, and she did not shop much because she got paranoid around a lot of people.  (*Id.*)  She could pay bills, count change, handle a savings account, and use a checkbook.  (*Id.*)  She read books when her concentration was good and played cards.  (*Id.* at 282.)  Her depression had worsened, so she spent most of her time in bed or asleep in her room.  (*Id.*)  While she reported staying to herself most of the time, she also went to work and church on a regular basis.  (*Id.*)  While Taylor stated she could only walk for twenty miles minutes before she started beathing heavily, she also could walk two miles before needing to rest for half an hour.  (*Id.* at 283.)  Taylor reported her concentration was off most times, she could only pay attention for ten minutes at the most, and she could not understand things like she used to be able to do.  (*Id.*)  She did not follow written instructions well, and spoken instructions had to be repeated until she understood.  (*Id.*)

On December 7, 2017, Taylor saw Michael Golz, PT, for her first physical therapy appointment.  (*Id.* at 363.)  Golz noted Taylor was on medical leave from work.  (*Id.*)  Taylor reported pain and some instability in her right knee.  (*Id.*)  Taylor rated her current left knee pain as a 6/10 and told Golz her pain

ranged from a 6/10 at best to an 8/10 at worst.  (*Id.*)  She described her pain as constant.  (*Id.*)  Bending the knee, as well as moving after prolonged sitting and walking, aggravated her pain, while ice and position changes alleviated it.  (*Id.*)  Golz noted the swelling of Taylor's left knee was going down.  (*Id.*)  Taylor reported her pain had improved since her surgery and that she was going to get a brace.  (*Id.* at 364.)  On examination, Golz found antalgic gait, decreased stance time on the left lower extremity, reduced muscle strength on the left, and grossly normal bilateral hip and ankle motion.  (*Id.*)  Golz noted Taylor tolerated the session well with minimal complaints of pain and difficulty.  (*Id.* at 365.)

On December 12, 2017, Taylor saw Golz for her second physical therapy appointment.  (*Id.* at 370.)  Golz noted Taylor displayed maximum effort during the session.  (*Id.* at 371.)

On December 14, 2017, Taylor saw Morris for follow up.  (*Id.* at 409.)  On examination, Morris found Taylor well-groomed, with average demeanor, cooperative behavior, average eye contact and activity, clear speech, "anxious, cooperative [and] positive" mood, congruent affect, logical thought process, and good insight and judgment.  (*Id.* at 409-10.)  Taylor reported being off her medication for three months because of changes and rescheduling.  (*Id.* at 410.)

That same day, Taylor failed to appear for her third physical therapy session.  (*Id.* at 373.)

On December 19, 2017, Taylor again failed to appear for her physical therapy session.  (*Id.* at 374.)

On December 29, 2017, Taylor saw Dr. Frangiamore for follow up post-surgery.  (*Id.* at 435.) Taylor reported moderate pain and told Dr. Frangiamore she had been in a car accident on December 25th and her left knee hit the dashboard of the car.  (*Id.*)  Taylor said the swelling and bruising had gone down since the accident.  (*Id.*)  Taylor reported that before the accident, her knee was doing well.  (*Id.*)  On examination, Dr. Frangiamore found no erythema, mild swelling, no effusion, intact sensation, no gross motor deficits, and quadricep atrophy compared to the contralateral side.  (*Id.*)  Dr. Frangiamore noted they discussed the importance of appropriate mobilization and that Taylor was to continue with her

physical therapy.  (*Id.*)  While the accident set Taylor back, it was a small setback and since Taylor had been doing well before the accident, Dr. Frangiamore suspected she would be doing well again.  (*Id.*)  He prescribed an anti-inflammatory medication for Taylor's acute injury.  (*Id.* at 436.)

On January 22, 2018, Taylor saw Scott Rohrbaugh, CNP, at Coleman Professional Services to establish care.  (*Id.* at 472.)  Taylor reported feeling down lately, mood swings, irritability, impulsivity, being mostly depressed, lack of energy and motivation, feeling hopeless and helpless, and occasional crying spells.  (*Id.*)  Taylor rated her depression as a 7/10 and her anxiety as a 7/10.  (*Id.*)  Rohrbaugh noted Taylor had stopped taking her Remeron because of "over sedation."  (*Id.*)  On examination, Rohrbaugh found normal gait and station, average and cooperative demeanor/behavior, normal eye contact, clear speech, "'swinging'" mood, euthymic affect, normal language, logical thought process, unremarkable thought content, unremarkable cognition/orientation, and fair/intact insight/judgment.  (*Id.* at 474.)  Rohrbaugh prescribed a low dose of Risperdal.  (*Id.* at 476.)

On January 30, 2018, Taylor saw Alicia Brown at Coleman Professional Services for counseling.  (*Id.* at 485.)  Taylor reported increased stress because of her stepson and his mother and that she was ready to go back to work.  (*Id.*)  Taylor also reported increased anxiety and mood swings because she had not had her medication for over a month and frustration at losing her job.  (*Id.* at 486.)  Taylor told Brown she did things around the house to keep busy and that she had a dog to care for.  (*Id.* at 486-87.)  Taylor reported considering going back to her old job since they asked her if she would come back.  (*Id.* at 488.)  On examination, Brown found Taylor well-groomed, with average demeanor, cooperative behavior, average eye contact and activity, clear speech, stressed mood, full affect, logical thought process, and good insight and judgment.  (*Id.* at 485-86.)

On February 2, 2018, Taylor saw Jennifer Ogorzolka, PA-C, for follow up regarding her left knee.  (*Id.* at 693.)  Taylor reported minimal pain, although she had "rare intermittent achiness" that she believed

9

got worse when the weather got colder.  (*Id.*)  Taylor told Ogorzolka she had no complaints at that time. (*Id.*)  Taylor reported she had discharged herself from physical therapy several weeks earlier because of issues with insurance-provided transportation, but she was compliant with her home exercise program and remained in communication with her physical therapist.  (*Id.*)  Taylor told Ogorzolka she was "[v]ery happy" with her progress and was "[b]ack to doing everything she want[ed] to be doing."  (*Id.*)  On examination, Ogorzolka found no erythema, swelling, or effusion, intact sensation, no gross motor deficits, no quadricep atrophy compared to the contralateral side, and a full, pain-free range of motion. (*Id.*)

On February 19, 2018, Taylor saw Rohrbaugh for follow up and reported feeling better.  (*Id.* at 478.)  Taylor told Rohrbaugh her mood had improved, as had her depression and anxiety, and while she had occasional mood swings, she was able to control them.  (*Id.*)  Taylor rated her depression and anxiety as a 5/10.  (*Id.*)  Taylor's cardiologist had increased her medication, and Taylor said she had been sleeping better with the increased dose.  (*Id.*)  On examination, Rohrbaugh found normal gait and station, average and cooperative demeanor/behavior, normal eye contact, clear speech, "'better'" mood, euthymic affect, normal language, logical thought process, unremarkable thought content, unremarkable cognition/orientation, and fair/intact insight/judgment.  (*Id.* at 480-81.)  Taylor reported she wanted to stay on her current medication regimen.  (*Id.* at 483.)

On March 7, 2018, Taylor saw Kayla Craig at Coleman Professional Services for counseling.  (*Id.* at 489.)  Taylor reported feeling better since getting her medication and that she had "'no stressors recently.'"  (*Id.*)  Taylor told Craig she had not been doing much, just visiting with her grandchildren.  (*Id.* at 490.)  Taylor again reported doing things around the house to stay busy and caring for a dog.  (*Id.*)  On examination, Craig found Taylor well-groomed, with average demeanor, cooperative behavior, average

10

eye contact and activity, clear speech, euthymic mood, full affect, logical thought process, and average insight and judgment.  (*Id.* at 489-90.)

On May 22, 2018, Taylor saw Dr. Frangiamore complaining of increased pain and swelling of her left knee since her last visit.  (*Id.* at 695.)  Taylor reported she had started a new job as a valet at Akron Children's Hospital and she was walking a lot more.  (*Id.*)  Taylor told Dr. Frangiamore she had gone to the emergency room a week ago for bilateral lower leg and foot swelling.  (*Id.*)  Taylor reported she was diagnosed with peripheral edema, started on Lasix, and given a prescription for compression stockings. (*Id.*)  Dr. Frangiamore noted the Lasix helped and Taylor said she had the compression stockings in her car to wear to work that day.  (*Id.*)  On examination, Dr. Frangiamore found grossly normal gait, no significant lower extremity edema, intact sensation, normal motor strength, no evidence of erythema or effusion, mild swelling of the knee joint, tenderness over the medial patellar facet, pain and crepitus with patellar compression, full, pain-free range of motion with pain at extremes of flexion, no pain with weighted single-leg twist, and negative McMurray's testing.  (*Id.* at 698.)  Dr. Frangiamore believed some of the inflammation was related to the increased time Taylor was on her feet with her new job and administered a cortisone injection that day.  (*Id.* at 699.)  Dr. Frangiamore also noted some of the swelling may be unrelated to Taylor's knee surgery.  (*Id.*)

On May 31, 2018, Taylor saw Dr. Courson for follow up.  (*Id.* at 521.)  Taylor reported recurrent episodes of palpitations, which made her feel very tired and affected her job.  (*Id.*)  Taylor reported these episodes occurred about every two weeks, and although they tended to occur with activity, they have also occurred at rest.  (*Id.*)  On examination, Dr. Courson found normal rate, regular rhythm, normal heart sounds, no gallop, no friction rub, no murmur, normal range of motion, no edema or tenderness, normal gait, and normal coordination.  (*Id.* at 521-22.)  Dr. Courson noted Taylor was going to wear an event monitor to reassess her episodes.  (*Id.* at 522.)

On June 11, 2018, Taylor went to the emergency room after waking up with heart palpitations and feeling lightheaded and dizzy.  (*Id.* at 662.)  Taylor went to work at Akron Children's Hospital and was sent to the emergency room for evaluation.  (*Id.*)  Taylor denied chest pain but endorsed shortness of breath during the episode.  (*Id.*)  Taylor reported her episode resolved on its own, and she had not missed her medication.  (*Id.*)  On examination, treatment providers found normal rate, regular rhythm, normal heart sounds, intact distal pulses, no gallop, and no friction rub.  (*Id.* at 664.)  An EKG revealed NSR without ischemic or arrhythmic changes.  (*Id.*)  An EKG done at Akron Children's Hospital was consistent with the EKG at the emergency room.  (*Id.*)

On November 13, 2018, Taylor went to the emergency room after getting rear-ended while in traffic.  (*Id.* at 707.)  While Taylor had tenderness of the paraspinal muscles, she moved all extremities and had 5/5 strength throughout.  (*Id.* at 710-11.)  Treatment providers placed Taylor in a cervical collar and gave her Tylenol.  (*Id.* at 711.)  Tylenol improved her symptoms, and the cervical collar was removed. (*Id.*)  On reexamination, no tenderness was found.  (*Id.* at 712.)

On November 16, 2018, Taylor called 911 after "feeling like her 'heart was going to pound out of [her] chest.'"  (*Id.* at 745.)  EMS found Taylor in SVT on arrival and administered adenosine.  (*Id.*)  At the emergency room, Taylor appeared to be in sinus tach and said she felt much better.  (*Id.*)  When EMS arrived, Taylor's heart rate was 200; at the hospital, it was 109.  (*Id.* at 746.)  On examination, Taylor's heart rhythm was regular with tachycardia.  (*Id.*)  During her time at the emergency room, Taylor had no return of SVT and her heart rate remained stable, decreasing throughout her entire stay with a heart rate in the 90s at discharge.  (*Id.* at 752.)

On December 6, 2018, Dr. Courson wrote a letter explaining that Taylor experienced an apparent syncopal episode while at work, although he did not treat her for that episode and could not provide

12

additional information. (*Id.* at 500.) Dr. Courson stated Taylor had recurrences of her SVT despite increasing doses of antiarrhythmic medication. (*Id.*)

On February 1, 2019, Taylor saw Kimberly Croom, MSN, APRN, CNP, in preparation to undergo a repeat electrophysiology study and SVT ablation. (*Id.* at 798.) Croom noted that despite an increase in Taylor's medication, she continued to have episodes. (*Id.*) While Taylor had not had a recurrence of SVT on the increased dose, she complained of dizziness with the increased dose. (*Id.*) On examination, Croom found no murmur, gallop, rubs, or ectopy. (*Id.* at 800.)

On February 19, 2019, Taylor underwent an electrophysiology study where Dr. Courson was unable to induce atrial tachycardia. (*Id.* at 668.) Dr. Courson admitted Taylor to load the antiarrhythmic medication, Sotalol. (*Id.*) Dr. Courson also implanted a loop recorder due to Taylor's palpitations. (*Id.*) Dr. Courson noted:

> We have made multiple adjustment [sic] in her medications and were unable to suppress her symptoms. We reattempted EP study early this week and despite an aggressive study were unable to induce sustained SVT, we had planned on starting sotalol which was done this admission . . . I recommended an implantable loop monitor this will allow us to continue to follow her arrythmia over a long period of time, importantly this will allow us to correlate symptoms with SVT recurrence and this will help guide antiarrhythmic therapy. As noted above she has a uniquely, challenging rhythm to manage.

(*Id.* at 680-81.)

On May 2, 2019, Taylor saw Croom for follow up. (*Id.* at 813.) Taylor reported occasional dizziness and palpitations, although she denied recurrent syncope. (*Id.*) On examination, Croom found no murmur, gallop, rubs, or ectopy. (*Id.* at 815.) Taylor's loop recorder showed no arrythmia. (*Id.*) Croom noted:

> She is doing well from an arrhythmia and device standpoint. EKG from March 2019 is within normal limits for sotalol administration. BMP was drawn February 2019 and is normal. Loop recorder interrogations reveal no recurrence of arrythmia. She will follow up with Dr. Courson in 6 months.

(*Id.*)

13

C.      **State Agency Reports**

1.      **Mental Impairments**

On December 27, 2017, Cynthia Waggoner, Psy.D., found mild limitations in Taylor's abilities to understand, remember, or apply information and adapt or manage oneself, and moderate limitations in her abilities to interact with others and concentrate, persist, or maintain pace.  (*Id.* at 85, 97.)  Dr. Waggoner opined Taylor appeared capable of tasks with limited to no contact with others.  (*Id.* at 89, 101.)  Dr. Waggoner further opined Taylor seemed capable of handling tasks without many changes in day-to-day tasks.  (*Id.* at 90, 102.)

On March 23, 2018, on reconsideration, Sandra Banks, Ph.D., found the same limitations in Taylor's abilities under the Paragraph "B" criteria.  (*Id.* at 113, 128.)  Dr. Banks found Taylor could be expected to carry out simple and moderately complex tasks at an adequate pace, could interact appropriately with others during occasional, superficial exchanges in a stable work setting, and could adapt to routine, predictable changes in day-to-day tasks.  (*Id.* at 117-18, 132-33.)

2.      **Physical Impairments**

On January 27, 2018, Indira Jasti, M.D., opined Taylor could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 87, 99.)  Taylor's ability to push and/or pull was limited to occasional on the left lower extremity.  (*Id.*)  Dr. Jasti opined Taylor could occasionally climb ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.*)  Taylor could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 87-88, 99-100.)  Taylor must avoid all exposure to hazards.  (*Id.* at 88, 100.)

On April 24, 2018, Lynne Torello, M.D., affirmed Dr. Jasti's findings on reconsideration.  (*Id.* at 115-16, 130-31.)

14

D.     **Hearing Testimony**

During the July 24, 2019 hearing, Taylor testified to the following:

- She drives but has not because the heart medication she takes makes her tired and slows her heartrate down.  (Tr. 46.)  Her husband drives her where she needs to go when he is not working.  (*Id.* at 46-47.)  When he is working, she is at home.  (*Id.* at 47.)

- She last worked about a year and a half to two years ago.  (*Id.*)  She stopped working because she had an episode where her heart condition acted up and her cardiologist would not let her return.  (*Id.*)  She was working part time.  (*Id.*)

- She had surgery on her knee.  (*Id.* at 49.)  Her knee has not felt better since the surgery; it still slips.  (*Id.* at 49-50.)  She does not wear a brace.  (*Id.* at 50.)  She has not seen her orthopedic surgeon in two years.  (*Id.*)  Physical therapy did not help at all.  (*Id.*)  She does not use an assistive device to walk.  (*Id.*)  She used crutches for two weeks after her knee surgery.  (*Id.* at 64.)

- After she wakes up in the morning, she takes her heart medication and does little things around the house.  (*Id.* at 54.)  But her medication makes her tired, so she spends half the day laying down until her husband gets home from work.  (*Id.*)  If she has errands or things to do, her husband takes her.  (*Id.*)  Then she comes back home and lays down.  (*Id.* at 54-55.)  She lays down for two to three hours a day.  (*Id.* at 55.)

- On a typical day, she wakes up and takes a shower.  (*Id.* at 60.)  She gets dressed, makes something to eat, and sits in the living room.  (*Id.*)  She reads her Bible, then gets up.  (*Id.*)  If there's dishes, she will clean them.  (*Id.*)  She watches the Price is Right every day.  (*Id.*)  After that, she gets ready to take her nap.  (*Id.*)  She naps until 2:45, and her husband will be home in about an hour and a half.  (*Id.*)  She sits and waits for him to come home.  (*Id.*)  If she has any errands to do, her husband takes her.  (*Id.*)  She goes to church every Sunday.  (*Id.* at 61.)  She can make it through the service, which lasts about an hour and fifteen minutes.  (*Id.*)  She sees her dad twice a week.  (*Id.*)  She talks to her mom on the phone and visits her when her husband takes her over there.  (*Id.*)  Her husband does the grocery shopping.  (*Id.*)  She sometimes goes with him.  (*Id.* at 61-62.)

- She sees her cardiologist every six months unless she has frequent episodes and he calls her into the office.  (*Id.* at 56.)

- Her hip has been bothering her, but she has not seen anyone about it.  (*Id.* at 57.)

- She can stand for 15 to 20 minutes before she needs to sit down.  (*Id.*)

- When she woke up that morning, she felt dizzy, so she laid down flat like she is supposed to do.  (*Id.*)  Once she took her medication the dizziness eased.  (*Id.*)  She

15

has fallen before because of dizziness or passing out.  (*Id.*)  The last time she fell was the last episode she had, and she hit the floor.  (*Id.* at 57-58.)

• She also has bipolar disorder.  (*Id.* at 58.)  She was going to Coleman Professional Services every three weeks but stopped going because of her heart condition.  (*Id.*)  Her cardiologist was able to prescribe her medication.  (*Id.*)  She now sees a doctor at Jackson Family Practice.  (*Id.*)  She is taking Risperdal, which makes her tired.  (*Id.*)  She was unsure whether the medication helped.  (*Id.*)  She has mood swings, she is hyper, sometimes she cannot be still, she fidgets, and her concentration is off.  (*Id.* at 58-59.)

• As for hobbies, she reads.  (*Id.* at 59.)  She can read for 15 minutes before needing to put the book down.  (*Id.*)  She does not watch much TV.  (*Id.*)  She has four grandchildren and usually has two of them with her.  (*Id.*)  She is never alone with her grandchildren.  (*Id.* at 60.)

• Her hip pain that day was a 6/10 because she was sitting; it would be worse if she were standing.  (*Id.* at 62.)  Her knee pain was non-existent, although it is usually an 8/10.  (*Id.*)  Her knee pain is an 8/10 about two or three times a month.  (*Id.*)  It also hurts if it rains.  (*Id.*)

• She has to elevate her feet during the day because of the swelling.  (*Id.* at 63.)  About once or twice a month she cannot wear shoes because of the swelling.  (*Id.*)

The VE testified Taylor had past work as a retail cashier/stocker and cosmetologist.  (*Id.* at 67-68.)

The ALJ then posed the following hypothetical question:

Mr. Nimberger, I am going to have a number of hypothetical questions for you today.  Now with any hypothetical question, I do want you to assume somebody of Mrs. Taylor's age, education, and that work history you just described for us.  Now the first hypothetical individual would be at the light exertional range and would have the following additional limitations: she could only occasionally push, pull, and operate foot controls with the left lower extremity; she could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; now she would need to avoid concentrated exposure to extreme cold and vibrations as well as extreme heat and humidity and avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and the operation of motor vehicles; now this individual could perform simple and all the way to moderately-complex tasks, but would not be able to perform tasks at a production rate pace such as assembly line work; she could interact with supervisors and a small group of familiar coworkers with no more than incidental interaction with the general public and she'd be limited to superficial contact and by that I mean no sales, arbitration, negotiation, conflict resolution, or confrontation; no group tandem or collaborative tasks; no management direction or persuasion of others; now lastly, she could respond appropriately to occasional change in her routine work setting, but any such

16

changes would need to be easily explained and/or demonstrated in advance of gradual implementation.  Would that first hypothetical individual be able to perform any of the Claimant's past relevant work?

(*Id.* at 68-69.)

The VE testified the hypothetical individual would be able to perform Taylor's past work as a retail cashier/stocker and cosmetologist.  (*Id.* at 69.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as office cleaner, wire worker, and food worker.  (*Id.* at 69-70.)

The ALJ modified the hypothetical to reduce the exertional level to sedentary.  (*Id.* at 70.)  The VE testified the hypothetical individual could not perform Taylor's past work.  (*Id.*)  The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as addresser, document preparer, and table worker.  (*Id.* at 70-71.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

17

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Taylor was insured on her alleged disability onset date, March 2, 2017, and remains insured through December 31, 2023, her date last insured ("DLI"). (Tr. 21.) Therefore, in order to be entitled to POD and DIB, Taylor must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since March 2, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: obesity; acute medial meniscus tear, chondromalacia patella, and osteoarthritis of the left knee, status post partial medial meniscectomy; degenerative disc disease of the bilateral hips; supraventricular tachycardia, atrial tachycardia, palpitations, and precordial pain, status post placement of an implantable loop recorder; syncope, and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant occasionally can push, pull and operate foot controls with the left lower extremity, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never can climb ladders, ropes or scaffolds.  She must avoid concentrated exposure to extreme cold, extreme heat, humidity and vibrations, and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and operation of motor vehicles.  She is limited to simple to moderately complex tasks, but not at a production rate pace (i.e., assembly line work), and is limited to occasional change in a routine work setting so long as any such changes are easily explained and/or demonstrated in advance of gradual implementation. She occasionally can interact with supervisors and [sic] small group of familiar coworkers.  She incidentally can interact with the general public, and is limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and management, direction or persuasion of others.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December **, 1972 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 2, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-32.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different

conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

21

## VI. ANALYSIS

In her first assignment of error, Taylor argues the ALJ committed harmful error when the RFC did not consider the effect of the combination of her severe impairments on her ability to engage in substantial gainful activity on a sustained basis.  (Doc. No. 14 at 9.)  Under this broad assertion, Taylor raises several arguments regarding the ALJ's decision: (1) the ALJ failed to cite any evidence to support his conclusion that Taylor did not meet or equal Listings 1.02, 1.03, and 4.05; (2) the ALJ erred at Step Three in finding Taylor only had moderate limitations in the "B" criteria under Listing 12.04;[3] (3) the ALJ failed to consider the impact of Taylor's obesity on her cardiovascular and musculoskeletal impairments; and (4) the ALJ failed to base the RFC on a medical opinion.  (*Id.* at 9-16.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Taylor did not meet or medically equal a listing.  (Doc. No. 16 at 10.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

---

[3] The Court notes Taylor did not mention Listing 4.05 at the hearing and conceded that this was not a Listing case.  (Tr. 44.)  However, the Commissioner does not claim that Taylor forfeited that argument and because "'a potential forfeiture may itself be forfeited,'" this court may still decide whether the listing applies to this case.  *Linderman v. Comm'r of Social Sec.*, No. 1:16-CV-944, 2017 WL 2304281, at *8 (N.D. Ohio Apr. 6, 2017) (quoting *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013)) (additional citations omitted), *report and recommendation adopted by* 2017 WL 2303996 (N.D. Ohio May 25, 2017).

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1520(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge

23

between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

However, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett*, 2015 WL 853425, at *16. *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. Mar. 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

At Step Two, the ALJ found that Taylor's supraventricular tachycardia, atrial tachycardia, palpitations, precordial pain, and syncope constituted severe impairments.  (Tr. 24.)  At Step Three, the ALJ stated that he considered Listings 1.02, 1.03, and 4.05, and addressed those listings as follows:

> The record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claimant's impairment(s) medically equal a listed impairment, including listings 1.02, 1.03 and 4.05.

(*Id.*)

There is no question the ALJ's analysis at Step Three does not meet the requisite standards set forth above; the ALJ failed to "actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review." *Reynolds*, 424 F. App'x at 414-15.

With respect to Listing 4.05, nor can reading the decision as a whole save the deficiencies in the ALJ's Step Three analysis.  The ALJ found as follows regarding Taylor's cardiac impairments:

In terms of the claimant's alleged cardiac impairments, the record undoubtedly evidences that the claimant carries diagnoses of supraventricular tachycardia, atrial tachycardia, palpitations, and precordial pain.  However, the record, when considered as a whole, is not supportive of the contention that the existence of these impairments would be preclusive of all types of work.

Even prior to her alleged onset date, the claimant sought treatment with a cardiologist, care that thereafter continued with consistent appointments every six months.  The claimant did require emergency attention in June and November 2018 but no subsequent hospitalization.

As part of her treatment, the claimant was prescribed a regimen of medication intended to address her symptoms without indication that it caused significant side effects or was ineffective, especially considering the regimen only minimally fluctuated; the dosing was only sporadically adjusted to better address the claimant's symptoms.  More specifically, the claimant admitted "doing well" while her cardiologist noted that she was "stable from a rhythm standpoint" as of November 9, 2017 (1F/1) and, despite reaching the maximum dose of her medication so the brand had to be changed and a loop recorder implanted in February 2019 (13F/94; *see also* 11F; 13F/106), the claimant was considered "stable" and "doing well from an arrythmia standpoint and device standpoint" by May 2, 2019 (16F/18).

(Tr. 28.)

The ALJ failed to thoroughly analyze the evidence regarding Taylor's heart condition in the RFC analysis, focusing on the positive findings while ignoring the ones supportive of disability.  (*Id.*)  For example, the ALJ failed to mention that: in May 2018, Taylor continued to experience recurrent episodes of palpitations that occurred both with activity and at rest and which were affecting her job, and her cardiologist had her wear an event monitor to reassess her episodes; Taylor experienced a syncopal episode at work in 2018; and even after implantation of the loop recorder, Taylor continued to have dizziness and palpitations, though no recurrent syncope.  (Tr. 500, 521-22, 813-15.)  While the ALJ mentioned the two times Taylor received treatment in the emergency room for her cardiac conditions, he failed to discuss that in November 2018, when EMS arrived, Taylor's heart rate was 200 and at the hospital, it was 109.  (*Id.* at 746.)  On examination, Taylor's heart rhythm was regular with tachycardia.

25

(*Id.*)  Therefore, even though the ALJ mentioned this evidence, he failed to characterize the treatment records properly and he failed to *analyze* this evidence.

As explained in detail above, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence.  *Shrader*, 2012 WL 5383120, at *6.  In addition, an ALJ may not overlook or ignore contrary lines of evidence.  *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

As this matter is being remanded for further proceedings consistent with this opinion, and in the interests of judicial economy, the Court will not address Taylor's remaining assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION

**IT IS SO ORDERED.**

Date: October 4, 2021

s/ Jonathan Greenberg
Jonathan D. Greenberg United States
Magistrate Judge

26